# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-1127-20
                 A-1202-20

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

J.R.-R. and G.R.-S.,

      Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF A.R.-R.
and G.J.R.-S., minors.

_____

Argued May 31, 2022 – Decided August 12, 2022

Before Judges Rose and Enright.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Cumberland County, Docket Nos. FG-06-0015-19 and FG-06-0056-19.

Laura M. Kalik, Designated Counsel, argued the cause for appellant J.R.-R. (Joseph E. Krakora, Public Defender, attorney; Laura M. Kalik, on the briefs).

Beth Anne Hahn, Designated Counsel, argued the cause for appellant G.R.-S. (Joseph E. Krakora, Public Defender, attorney; Beth Anne Hahn, on the briefs).

Amy Melissa Young, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Acting Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Amy Melissa Young, on the brief).

Noel C. Devlin, Assistant Deputy Public Defender, argued the cause for minors (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Noel C. Devlin, of counsel and on the brief).

PER CURIAM

In these consolidated appeals, defendants J.R.-R. (Jenny) and G.R.-S. (George) separately challenge the termination of parental rights to their sons, A.R.-R. (Alex) and G.J.R.-S. (Gabriel).[1] The Division of Child Protection and Permanency (the Division) brought the within guardianship action pursuant to N.J.S.A. 30:4C-11 to -15.4, after filing an abuse or neglect action under N.J.S.A.

---

[1] We use initials and pseudonyms for defendants, their children, and the resource parents to protect their privacy interests. R. 1:38-3(d)(12). We also refer to defendants and the resource parents by first names for the convenience of the reader. We intend no disrespect in doing so.

2

A-1127-20

9:6-8.21 to -8.73. The Title Nine case led to a trial court finding abuse or neglect by a preponderance of the evidence. We upheld that finding on appeal; our Supreme Court reversed.[2]

Defendants' petitions for certification in the Title Nine action were filed and granted after the guardianship trial started. Although the Court's opinion did not issue until nearly ten months after the entry of a final and amended judgment of guardianship, the parties agreed during the guardianship trial to proceed as if the Court already had ruled in defendants' favor. Through extensive negotiations, counsel made prodigious efforts to exclude or limit the use of certain evidence to ensure the guardianship judge's decision was not influenced by the trial court's Title Nine finding.

Defendants contend the efforts of counsel to limit what evidence the guardianship judge could consider failed, and reversal of the December 3 and December 22, 2020 guardianship judgments is warranted. We disagree, persuaded the termination decision was not tainted by the initial Title Nine finding but instead, flowed from the judge's appropriate analysis of whether

---

[2] N.J. Div. of Child Prot. & Permanency v. J.R.-R & G.R.-R., Nos. A-490-18 and A-491-18 (App. Div. Oct. 28, 2019), rev'd and remanded, 248 N.J. 353 (2021). Defendants advise G.R.-S. was improperly designated as "G.R.-R." in the Title Nine action and ensuing appeals.

A-1127-20

defendants were capable of parenting Gabriel and Alex well after Gabriel was injured as an infant.  Thus, we affirm the challenged judgments.

I.

To place the legal issues in context, we recount, chronologically, the significant facts, not only from the testimony adduced at trial but the heavily redacted record before us.

Defendants came separately to the United States from Guatemala.  Both primarily spoke Popti, a rare Mayan language.  Jenny, now forty-two, grew up in an agrarian society, did not attend school, and never learned to read or write.  George, now thirty-nine, attended school in Guatemala up to the fourth grade.

Defendants met in 2015 and began a committed relationship.  Their sons, Gabriel and Alex, were born in May 2016 and September 2018, respectively.

In March 2017, when Gabriel was nearly eleven months old, he was running a fever for a couple of days and vomiting.  By the time defendants brought him to his pediatrician, Gabriel was in respiratory distress.  The infant was transported by ambulance to Inspira Medical Center in Vineland.  From there, he was transferred to the Nemours/Alfred I. duPont Hospital for Children in Delaware, where he was diagnosed with bacterial meningitis, retinal hemorrhages, bilateral subdural hematomas, acute hypoxic respiratory failure,

sepsis and septic shock. Hospital staff noted Gabriel had bruises on his forehead, temple, ear and eyelid, as well as small linear abrasions on the right side of his face, inside his left ear, and in a neck skinfold. Based on a subsequent skeletal survey, Gabriel also was diagnosed with an ulna fracture of the right forearm that had not fully healed.

Gabriel's condition prompted a referral to the Division. During the Division's investigation, defendants claimed to have no knowledge of how Gabriel was hurt, but suggested he hit himself in the head with a remote control. They also represented they were Gabriel's sole caregivers.

In April 2017, the Division filed a Title Nine complaint, seeking custody of Gabriel. The Division alleged the infant's medical condition became emergent due to defendants' delay in taking him to a doctor, and he had some unexplained bruising. It also expressed concern about defendants' cognitive capacity for safe parenting. The court placed Gabriel in the Division's custody and granted defendants weekly supervised visitation.

Seven days later, Gabriel was discharged from the hospital and placed with non-relative resource parents, A.R. (Art) and S.R. (Sue). Upon his release from the hospital, Gabriel had to wear a neck collar and needed appointments

with various specialists, including healthcare providers specializing in ophthalmology and neurosurgery.

According to Rosalyn Soler, a Division caseworker, Gabriel was placed with Art and Sue because of their childcare experience and ability to handle Gabriel's medical needs. While exploring options for Gabriel's placement, the Division asked defendants if any friend or family member could care for Gabriel. Jenny offered her sister and brother, but these individuals were "ruled out."[3] The record is devoid of any other names defendants provided for Gabriel's placement.

In April 2017, with defendants' consent, Gabriel traveled to Alabama with his resource parents, and met Sue's niece, M.S. (Mary), as well as her husband, T.C. (Ted). Thereafter, Mary and Ted routinely enjoyed extended visits with Gabriel. And once Alex was born, Mary and Ted also visited with the younger child. Typically, Mary and Ted visited with the boys once a month.

In May 2017, Gabriel was airlifted to duPont Hospital due to swelling in his brain. He underwent emergency surgery to place a shunt in his head and drain fluid from his brain. The following month, he was admitted to the hospital

---

[3] When the Division later sought to reassess Gabriel's maternal aunt and uncle, it could not contact them, as they purportedly returned to Guatemala.

twice for issues related to his medical condition. Gabriel also required occupational and speech therapy and needed to wear a helmet due to concerns about him falling.[4]

The Division arranged for defendants to undergo a series of parental capacity evaluations with Dr. Katherine Pérez-Rivera. During the first set of evaluations of the couple in 2017, Dr. Pérez-Rivera noted Jenny was "unclear as to why [Gabriel] was hospitalized" earlier that year. Also,

> when asked at what age did [Gabriel] sit up, crawl, walk, talk, eat solids, [Jenny] did not provide any answers. Instead, the Popti translator informed [Dr. Pérez-Rivera] that [Jenny] was acknowledging understanding the questions, but would only answer that this was her first child ever and that she was a new parent . . . and . . . had very limited education.

Dr. Pérez-Rivera determined Jenny's cognitive abilities were "poor."

When she evaluated George, Dr. Pérez-Rivera noted he also was "unclear as to why" Gabriel was hospitalized in March 2017. George told her that the day before Gabriel was hospitalized, he came home from work and "knew [Gabriel] had a fever because [the child] was hot." George consulted with a roommate about "what he should give" Gabriel for his condition and the

---

[4] Gabriel was medically required to wear a helmet until May 2019.

roommate advised George to "wait it out" until he saw the pediatrician the next day. George admitted to following the roommate's advice. George stated he had no way to take Gabriel's temperature then, having never owned a thermometer. Further, George advised Dr. Pérez-Rivera he had no knowledge of who caused Gabriel's injuries, but he "underscored . . . it could not have been [Jenny]," as he believed Jenny was an effective caretaker. The doctor opined George's cognitive abilities were in the "very poor" range.

Subsequently, Dr. Pérez-Rivera recommended Division services be provided to defendants in Spanish, with the assistance of a Popti interpreter, and that the Division refer defendants for private parenting lessons with Kathy Agosto, a therapist. Agosto spoke Spanish, and the record reflects defendants partially understood this language, although George was more fluent than Jenny. Agosto agreed to conduct therapy sessions with the assistance of a Popti interpreter to facilitate defendants' understanding during the sessions. She began working with the couple in September 2017, and within a month, she was utilizing the services of a Popti interpreter.

By November 2017, Agosto provided a treatment summary noting defendants were "always cooperative and engaged" in sessions, but "their knowledge and experience with parenting [was] limited." They advised Agosto

8

"this [was] their first child and . . . neither of them had ever helped care for a sibling in the past."

Agosto recommended Jenny begin some type of educational program, such as a literacy program. The therapist also shared "a few free apps" with defendants to assist them in parenting and informed them of programs provided through local libraries. Although Agosto was unsure if defendants could access the recommended programs, "due to their lack of identification documents," she confirmed there was an online Popti translation website to help Jenny "begin her language instruction." Agosto hoped if defendants could "read the Spanish language, elementary parenting texts might be found for them." Further, she encouraged defendants to learn more about parenting from family members who were parents themselves because defendants were "ignorant of the most basic child rearing techniques."

In December 2017, Agosto issued another treatment summary. She noted the Popti interpreter assisting defendants was "very helpful," but defendants continued to display a "very limited general fund of knowledge." Agosto encouraged Jenny to learn the alphabet and "practic[e] her letters since she [was] unable to write her name." Agosto believed Jenny needed to "move beyond" her lack of a formal education "if she expect[ed] to care for a child." Further, Agosto

9

suggested George should retrieve Spanish books from the library, if possible; she knew of no books on parenting in Popti. Agosto also advised George to consider enrolling in an English as a Second Language (ESL) class offered at a nearby library.

During the next two months, Agosto informed Jenny of a free ESL program nearby where she could "obtain a picture book with . . . words in Spanish and . . . English." Further, she instructed defendants on: the use of a thermometer in case Gabriel ran a fever; how to download apps on their "Smart Phone"; and how to plot out a bus route, considering defendants did not drive or have a car. Agosto described therapy sessions as "slow work due to . . . many cultural challenges." Although she stated defendants "need[ed] much more" than what she could offer them in weekly hourly sessions, she confirmed "[m]ultimodal modalities of instruction will continue to be explored." She hesitated to recommend defendants' reunification with Gabriel, as the child was expected to "continue to have very serious medical needs."

When Agosto learned Jenny was pregnant with Alex, Agosto encouraged defendants to "utilize the internet and their supports in the community to augment their understanding . . . of parenting and gain[] familiarity with all they will need to guide and nurture their children." Additionally, she told defendants

10

it was necessary for them "to demonstrate parenting competence," because the Division would want to ensure their home was a "safe environment," particularly since it had been unable to determine who or what caused Gabriel's injuries.

In March 2018, the court found reunification might soon be possible because defendants were "engaged in services." Contemporaneously, Agosto advised the Division she could not assist defendants any longer because they had "plateaued." However, considering the Division's prior difficulty in securing a willing provider to work with the existing English to Spanish to Popti interpretation system, and Agosto's experience in assisting migrant workers, the Division persuaded Agosto to resume working with defendants months later.

At the Division's behest, Dr. Pérez-Rivera re-evaluated defendants for parental capacity when Gabriel was about twenty-three months old. In George's April 2018 evaluation, the doctor preliminarily noted George communicated with her in Spanish, having advised he was fluent and comfortable in speaking this language during their sessions. She reported George "expressed himself in Spanish effortlessly and quite adequately."

George advised Dr. Pérez-Rivera that Jenny was four months pregnant. He also disclosed for the first time she had two other children from a prior relationship, and those children were living in Guatemala. He apologized for

11

not revealing this information sooner, explaining the lack of disclosure was "due to a misunderstanding."

Although George acknowledged he was not Gabriel's primary caretaker before the child's removal, he told Dr. Pérez-Rivera that Gabriel "skipped crawling and started walking at [seven] months." He also stated Gabriel "began sitting up at [seven] months." Asked about this discrepancy, George simply stated Gabriel was his first child. When the doctor further probed his knowledge of developmental milestones, George stated children generally begin to walk at about eighteen months, "babble" between eighteen months and two years old, and could only be understood at age three. Dr. Pérez-Rivera noted George could not explain why milestones he reported for Gabriel were "considerably inconsistent with his reports on the developmental milestones of the typical developing child."

Dr. Pérez-Rivera geared part of her clinical interview to exploring George's "present understanding of [Gabriel's] . . . significant injuries." In that regard, she stated George claimed Gabriel was a "healthy and typically developing child" and Jenny felt the same way. When the doctor asked George to explain what would happen if Gabriel sustained a blow to his head without his helmet, George replied this would not be good for his son "since he had a

fever and had to go to the hospital."  George also admitted that because he did not know the English language he was "unable to communicate with [Gabriel's] treatment providers."

During Jenny's second parental capacity evaluation, Dr. Pérez-Rivera reported Jenny demonstrated an "improved ability to understand and speak Spanish," but remained "best able to express herself" in Popti.  According to the doctor, Jenny "denied understanding why [Gabriel] was found eligible for Early Intervention Services . . . [and] denied understanding why [the child was] wearing a helmet."  Although she was informed the helmet was needed to protect Gabriel's head, "this did not make sense to her as she [saw] him as a healthy boy."  Jenny also told the doctor she was "confident she was able to care for" Gabriel.  When the doctor asked Jenny to tell her about "all the children she had ever birthed, [Jenny] reported that [Gabriel] was her only child" and that she was pregnant with her second child.

Jenny was observed with Gabriel during her evaluation.  Dr. Pérez-Rivera noted Jenny placed the toddler on her lap facing away from her and "she rarely made any verbalizations through the [twenty-five] minutes that they were together, and only made eye contact with him when she was facing him while feeding him."  The doctor found while Jenny "successfully fed [Gabriel], she

13

sometimes did not read the nonverbal cues" the child gave Jenny, "such as not being interested in feeding all at once."

Dr. Pérez-Rivera also observed defendants jointly with Gabriel. She prompted the couple to change Gabriel's diaper. When they complied, the doctor saw George pushing and pulling Gabriel's penis. She further noted George

> began a game insinuating that he had pulled [Gabriel's] penis off[,] followed by a gesture in which he tossed the penis into the air. This went on for about [forty-five] seconds. [Jenny] was observed laughing throughout all this. She was also observed touching [Gabriel's] penis and pushing it inwards, albeit only once.

Dr. Pérez-Rivera notified caseworker Soler about this incident.

After conducting the second set of evaluations, Dr. Pérez-Rivera issued reports on each defendant, noting George's parenting capacity had improved since the first evaluation. She recommended, in part, that he receive a copy of Jenny's April 2018 parental capacity evaluation because he still "perceive[d] . . . [Jenny] as being a 'good caretaker,' which [was] contrary to" the doctor's findings. Dr. Pérez-Rivera also highlighted the importance of sharing her findings with George due to the impending birth of the couple's second child. Dr. Pérez-Rivera recommended any services be modified to account for George's "extremely limited cognitive functioning" and that the Division consider the results of her updated evaluation in deciding whether it should

14

"retain [its] present case goal, which was reported to be 'Termination of Parental Rights.'"

Regarding Jenny, Dr. Pérez-Rivera recommended services be geared to "take into consideration her limited cognitive functioning," that Jenny receive assistance in learning how to read, write, and become fluent in Spanish, and the Division "consider out of home placement for" Gabriel. Further, the doctor concluded Jenny withheld information from her and Agosto about having given birth to two children in Guatemala, and that Jenny had not told George she gave birth to a third child in the United States in 2014.[5]

In April and May 2018, Art and Sue advised the Division they wanted Gabriel to remain in their family. They also informed the Division Mary wanted to adopt Gabriel, but if this was not allowed, they would adopt Gabriel. The

---

[5] The record reflects the Division learned about Jenny's three older children in February 2018, when it received a referral confirming Jenny initiated prenatal care for her unborn child, Alex. That month, Soler asked Jenny about the son she birthed in 2014 but Jenny denied this child existed. Soler pressed the issue and told Jenny the Division might request a DNA test to rule out she was this child's mother. At that point, Jenny pleaded with Soler and her supervisor, in Spanish, "[p]lease do not do this. [George] does not know about that child and if he finds out[,] he will leave me. . . . I gave birth to this child and gave him away." Upon further investigation, the Division determined Jenny had not seen or contacted her son since his birth in 2014.

following June, Mary confirmed to Soler she was interested in adopting not only Gabriel, but Jenny's unborn child.

## II.

On June 5, 2018, following the conclusion of a five-day bench trial during which Drs. Allan DeJong and Joseph Scheller testified for the Division and defendants respectively, the trial court found by a preponderance of evidence defendants abused or neglected Gabriel while he was in their care, per N.J.S.A. 9:6-8.21.[6] J.R.-R., 248 N.J. at 364-65. The trial court's finding was based on the burden-shifting paradigm adopted in Division of Youth & Family Services v. D.T., 229 N.J. Super. 509 (App. Div. 1988), the use of which the Court

---

[6] N.J.S.A. 9:6-8.21 provides, in relevant part, that an abused or neglected child is one

> whose parent or guardian . . . (1) inflicts or allows to be inflicted upon such child physical injury by other than accidental means which causes . . . protracted impairment of physical or emotional health . . . (4) or . . . whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his [or her] parent or guardian . . . to exercise a minimum degree of care . . . in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof . . . .

> [N.J.S.A. 9:6-8.21(c)(1), (4).]

16

declared was structural error when it invalidated the finding.  J.R.-R., 248 N.J. at 365, 377-78.

Once the factfinding trial ended, the trial court accepted the Division's change in permanency plan for Gabriel for termination of defendants' parental rights.  The court found services provided by the Division had not significantly improved defendants' ability to provide safe parenting.

In July 2018, Art and Sue again advised the Division that Mary was looking to adopt Gabriel but if that was not possible, they would "keep" Gabriel. The next month, the Division instituted the guardianship action, and Gabriel's Title Nine action was terminated.

Additionally, during an order to show cause hearing in August 2018, the Law Guardian expressed concern that defendants repeatedly removed Gabriel's helmet during supervised visits.  Based on this representation, the same judge who conducted the Title Nine trial directed Gabriel's helmet not to be removed during supervised visits without court order.  The judge stated he would lift this restriction once a medical professional recommended it.

### III.

Alex was born in September 2018.  A Division caseworker reported Jenny did not know how to hold or burp Alex.  The caseworker noted Jenny failed to

17

support the baby's head when she held him and when the caseworker placed the infant on Jenny's shoulder to be burped, Jenny patted Alex's bottom until the caseworker corrected her. During Jenny's subsequent visit with both children in September 2018, a caseworker continually reminded her how to hold Alex. Also, the caseworker educated Jenny on how to prepare the baby's formula after Jenny stated she was unsure how to do so.

Six days after Alex's birth, the Division instituted a Title Nine action, alleging the newborn was at risk from the same inadequate parenting that remained a concern for Gabriel. The court granted the Division's request for care and supervision of Alex, permitted the Division to place the infant with Art and Sue (where Gabriel continued to live), and granted defendants weekly supervised visitation with the newborn. That same day, Jenny asked a caseworker if she could get her children back if she explained "what happened" to Gabriel; but Jenny declined to disclose any details about Gabriel's injuries at that time.

In October 2018, a caseworker asked Jenny if she and George had time to think about whether "they wanted to tell the Division what happened with" Gabriel. Jenny replied she wanted to talk with George "so they can figure out how to communicate it." However, George separately confirmed he wanted to

18

discuss what happened to Gabriel.

George revealed Jenny went to work with him in March 2017 and the couple left Gabriel with "the lady" who watched the baby. When defendants subsequently retrieved Gabriel and noticed the infant's condition, they suspected the child fell while in the babysitter's care. George apologized for not disclosing this sooner, explaining defendants had not wanted "the lady" to get into trouble. He subsequently told a caseworker he and Jenny "should have been honest from the beginning as they [had] been away from their children a lot longer than they thought" they would be.

The Division interviewed the babysitter after defendants identified her by name; she admitted watching Gabriel when he was three and four months old but denied injuring him. She also advised the caseworker there were issues with defendants' parenting. The Division was unable to conclude Gabriel was injured while in the babysitter's care.

During a court hearing in October 2018, the Deputy Attorney General (DAG) notified the judge that bonding and psychological evaluations were scheduled, and defendants had begun a new "one-on-one parenting education" program named "Casa Prac." Counsel also advised the judge defendants had

disclosed Gabriel was injured while in his babysitter's care. In response to this development, the judge stated:

> I have absolutely no recollection throughout the course of this entire procedure, FN and FG,[7] of hearing anything about a babysitter. <u>My recollection and understanding of the entire case since this court has been involved is that both parents have consistently stated that they had no idea what happened.</u>
>
> <u>That was not just to the Division but that was to medical personnel, when [Gabriel] was . . . being treated by the . . . neurologist at the . . . facility</u>. So, this is news to the court.
>
> [(Emphasis added).]

Considering the status of the case and anticipating the guardianship trial would soon commence, the Law Guardian asked the judge not only to order defendants and the children's resource parents in New Jersey to participate in bonding evaluations, but also to allow Mary and Ted to be included in the process. Defendants' attorneys objected, expressing concern Gabriel would be "farm[ed] out . . . to another state," namely Alabama, where Mary and Ted continued to live. Defense counsel questioned why Gabriel was not being removed from his existing placement if Art and Sue no longer wanted to adopt.

---

[7] The judge's mention of "FN" and "FG" matters refers to the Title Nine and Title Thirty proceedings, respectively.

The Law Guardian asked the judge not to foreclose the option of having Gabriel placed with Mary and Ted, arguing, "[s]ome of our clients have no options and we have two." Referring to Alex, the judge asked, "[w]hat about the sibling? There's [a Title Nine case]. Is the sibling being considered with . . . alternate parent[s] . . . [o]r are we looking to . . . separate the siblings?" The DAG represented Mary and Ted "would be willing to take both" children. Additionally, the DAG assured the court and counsel there was no plan for Gabriel to be moved at that time. She stated,

> the idea that [Art and Sue] don't want to adopt him is ridiculous. We've been saying all along that they will adopt him; they were just proposing another plan. As [the Law Guardian] said, there's two plans for this child and the court can determine which plan is more appropriate at the guardianship trial.

After argument concluded, the judge ordered that Gabriel not be moved "out-of-state without [him] . . . or some other Superior Court judge signing off on it." Also, anticipating defendants' parental rights might be terminated and a judge would need to determine "who may be able to mitigate whatever harm is done to the child," the judge directed the bonding evaluations to include not only Gabriel's resource parents but "the potential out-of-state adoptive family."

Further, the judge directed any evaluations of the New Jersey and Alabama resource parents be kept separate, not "intermingl[ed,]" so as "to keep

21

it clean." He also allowed defendants time to request a "follow-up assessment by their own expert" and offered to consider a "motion in limine . . . as to . . . the admissibility of" the report of the Division's expert "concerning the alternate placement." Additionally, over defendants' objection, the judge ordered without prejudice that Mary and Ted could be present for an upcoming mediation session between Art, Sue, and defendants. The judge stated, "[t]here's no harm to mediation. Nobody is forced to agree to anything."

In November and December 2018, Art and Sue confirmed to Dr. Pérez-Rivera during bonding evaluations they remained willing to adopt Gabriel should defendants' parental rights be terminated, and they were willing to adopt Alex if he became legally free. Around this time, Alabama licensed Mary and Ted as resource parents.

## IV.

On January 22, 2019, after the parties engaged in mediation, defendants agreed to a voluntary surrender their parental rights to Gabriel to Art and Sue. With the benefit of counsel, defendants testified their identified surrender was made knowingly and voluntarily. The judge credited their testimonies and accepted the surrender.

The next month, Art and Sue told a Division caseworker that after they adopted Gabriel, they planned to keep his name, albeit with a different spelling. They also advised the caseworker that if they became incapacitated, Mary was prepared to assume the role of Gabriel's caretaker. In March 2019, Art and Sue informed their caseworker they were in contact with their adoption attorney.

Around this time, Dr. Pérez-Rivera assessed defendants' parental skills relative to Alex. Following her evaluation, Dr. Pérez-Rivera issued a report stating, "[i]t is highly recommended . . . [the Division] continue to pursue the present case goal, which is 'Termination of Parental Rights.'"

In April 2019, the judge approved the Division's permanency plan to pursue termination of defendants' parental rights as to Alex, followed by adoption. The judge found "[b]oth parents lack the minimum level of parenting ability to safely care for the child despite the provision of numerous services by the Division." Once the Division filed a guardianship complaint relative to Alex, the judge terminated the corresponding Title Nine action.

V.

At a hearing in June 2019, counsel alerted the judge that while undergoing counseling with a Division provider, defendants claimed they did not realize they surrendered their parental rights to Gabriel. The judge responded, "there's

23

not one shred of credible evidence that would cause this court, then or now, to determine that [defendants] were . . . misled by either one of their attorneys." He added, the surrender was "knowing and voluntary . . . with the advice of good counsel." The judge also noted defendants testified they were "satisfied with the services of their attorneys" and they "indicated . . . they had sufficient time to discuss this matter with their attorneys." Nevertheless, because he could not foreclose the possibility of vacating the surrender, the judge directed new counsel to assume defendants' representation. Approximately two weeks later, successor attorneys were appointed for defendants.

Subsequently, the Law Guardian moved to vacate the identified surrender, claiming Art and Sue currently wished to withdraw from consideration as Gabriel's primary adoptive parents, due to their age, health issues, and the number of children they already had. According to the Law Guardian, Art and Sue hoped Gabriel and Alex would be adopted by Mary and Ted.

On August 19, 2019, the judge granted the Law Guardian's request to vacate the identified surrender, without objection from the defense or the Division. At that hearing, defense counsel alleged Art and Sue "perpetrate[d] a fraud on the court"; counsel requested a plenary hearing to address the resource parents' "material misrepresentations." Jenny's attorney specifically urged the

24

court not to permit visits between the boys and Mary and Ted, arguing the couple should not "benefit from any misrepresentations . . . given to" the court. Further, George's attorney contended the judge should place the boys in a different New Jersey resource home where they might be adopted. But neither defense attorney offered the name of an individual who might serve as an alternative placement. By this time, Gabriel had been in placement for almost two-and-a-half years and Alex had been in placement for close to a year.

The Law Guardian denied Art and Sue misrepresented their intentions about Gabriel. She argued that at the time of the identified surrender, Art and Sue anticipated adopting Gabriel and "would still adopt . . . if [the court] decided that the out-of-state relatives were not appropriate, or acceptable . . . because they love and are committed to these children."

After recapping defendants' testimony from the identified surrender hearing, the judge reiterated his finding that defendants "fully understood . . . they were surrendering irrevocably their rights to be the parents . . . of [Gabriel]." Also, in response to the Law Guardian's requests that he appoint guardians ad litem for defendants and have them undergo competency evaluations — requests not supported by the defense — the judge stated, "there is not any competent evidence before this court that suggests . . . [defendants]

do not have the competency to assist in their own cases, and adequate[ly] participate in this litigation." The judge noted defendants had "faithfully and regularly engaged with their . . . service providers . . . and [been] cooperative with the court."

Further, the judge rejected defendants' requests for a plenary hearing and the elimination of visits between the children and Mary and Ted. He found Art and Sue had "always held themselves out, up until recently to be the primary adoptive parents. It was not a secret. It was discussed not only in chambers but placed on the record that there were these relatives from Alabama that were interested in adopting [Gabriel] as well." He added, "[i]t was always expressed to this court both in chambers and on the record that [Art and Sue] were the primary adoptive parents, but were clearly open to having the folks from Alabama be the backup plan." Moreover, the judge stated he was "not . . . looking to have an 'I got you' moment for individuals who have done nothing but put the children's best interest at heart."

However, because the judge found the identified surrenders were "predicated on the understanding" Art and Sue, "either together [or] individually would adopt," and they no longer were willing to be the primary adoptive

26

parents, the judge vacated the surrender, reinstated Gabriel's case under the guardianship docket and consolidated it with Alex's guardianship case.

Based on the Division's revised plan to terminate defendants' parental rights, followed by adoption with either Art and Sue or Mary and Ted, the judge also ordered any outstanding bonding evaluations to include the boys' current New Jersey resource parents as well as their prospective resource parents in Alabama. Importantly, before concluding the hearing, the judge stated:

> [Alex] and [Gabriel] have only known [Art] and [Sue] as their resource parents . . . since [Gabriel's] initial removal as well as [Alex's] initial removal shortly after his birth, and due to regular visits and interaction, [the boys] also are to some degree familiar with the resource parents in Alabama.
>
> I find short of an emergent need for removal, that neither [Gabriel] nor [Alex] should be removed or separated from these current resource parents, or those other two folks from Alabama, providing that the appropriate checks and balances under state law and interstate law [are] satisfied.
>
> These children are not to be removed to any other home other than those four individuals, absent emergency, operation of law, or further order of the court. I find . . . that is what's in the best interest of the children to at least maintain some semblance of the status quo.
>
> If the Division in the meantime removes those children to Alabama, the Division will be solely responsible for providing [Jenny] and [George]

with . . . supervised visitation as to both of those children or either of those children once a week. They are entitled to supervised visitation. [Gabriel's] visitation is immediately reinstated. All visitation with [Gabriel] and [Alex] shall be supervised and conducted at least once a week effective immediately.

[(Emphasis added).]

Unfortunately, the August 19 order did not fully capture the judge's directives and only stated, in part, "[s]hort of an emergency removal, [Alex] and [Gabriel] shall not be removed from their current resource parents." Stated differently, the order made no mention of the judge having allowed the boys to be placed with their prospective resource parents in Alabama.

Several weeks later, the Division removed the children to Alabama to reside with Mary and Ted. When the parties next appeared in court in October 2019, defense counsel asked a newly assigned judge to conclude the children's move to Alabama was contrary to the August 19 order as no subsequent order had been entered on an emergent basis to allow the move. Understandably, the Law Guardian and Division disagreed, claiming defendants' position was inconsistent with what the prior judge ordered. The Law Guardian urged the court to "listen[] to CourtSmart or . . . hav[e] a conversation with [the judge who presided over the August 19 hearing]" to resolve the dispute.

Relying on the language contained in the August 19 order, the newly assigned judge expressed "concern about the way this took place short of an emergency." However, she declined to order the boys' return to New Jersey, and later directed a recording of the August 19 hearing to be released to counsel.

The judge also granted the joint request of the Law Guardian and the DAG, with consent of defendants' counsel, to modify the children's weekly visitation schedule. Specifically, the judge ordered defendants to have supervised visits twice a month over long weekends, so visits would occur on a Friday and the following Monday, understanding the boys would be flown to New Jersey for the visits. As Jenny's attorney aptly noted, this modified schedule "still essentially work[ed] out to once a week."

At a hearing conducted a few weeks later, the judge found the Division's permanency plan for the boys' adoption by their Alabama resource parents was "appropriate and acceptable." She scheduled the guardianship trial to commence later that month. Also, without objection from defense counsel, the judge executed an amended August 19 order "to correct the portion of the order regarding [the children's] removal to the State of Alabama." The amended order accurately reflected the prior judge's decision and provided, in part, "[s]hort of an emergency removal, [the children] shall not be removed from their current

29

resource parents <u>or the potential resource parents in Alabama</u>."  (Emphasis added).

In anticipation of trial, Dr. Alan Lee conducted psychological evaluations of defendants.  He also performed bonding evaluations between them and Gabriel and Alex.  Each evaluation was conducted with the assistance of a Popti interpreter.  Further, the doctor conducted bonding evaluations between Mary, Ted, and the boys.

Noting defendants' cultural and language barriers, Dr. Lee opted to test defendants for their psychological evaluations using only non-verbal IQ scales; he found both parents achieved a score of "0.1 percentile . . . meaning essentially 99.9% of all other people obtain[ed] a score higher" than them.  The doctor concluded these scores placed defendants in the "intellectually deficient classification."

Dr. Lee opined Jenny had "rather significant cognitive and intellectual limitations," "very chronic impairments in her cognitive and intellectual functioning," "significant difficulties accurately perceiving, interpreting and comprehending events around her," "poor problem[-]solving skills," and "[h]er knowledge of parenting and childrearing [was] remarkably poor, despite

having . . . children of very different ages born to her." He concluded Jenny's "prognosis for significant and lasting change is poor."

Similarly, following George's psychological evaluation, Dr. Lee found George had "significant cognitive and intellectual limitations," was "prone to poor judgment and decision making" and "[h]is knowledge of parenting and childrearing [was] deficient and poor." The doctor also determined George's "prognosis for significant and lasting changes" was poor.

Because Dr. Lee opined Jenny and George were "not supported as . . . independent caretaker[s] of the minor children at this time and within the foreseeable future," he recommended "permanency planning for the minor children besides reunification" to their birthparents. Dr. Lee also concluded defendants should undergo neurological evaluations "to survey for structural or organic etiology" for their "personal benefit, but not for the purpose[] of reunification."

After Dr. Lee conducted his comparative bonding evaluations, he concluded the boys did

> not have a significant and positive psychological attachment or bond with [their birthparents]; related to this, there is a low risk of either child suffering severe and enduring psychological or emotional harm if the child[ren]'s attachment and relationship with [their birthparents] is permanently ended. Both children are

31

in the process of forming a significant and positive psychological attachment and bond with the proposed caretakers, [Ted] and [Mary], and assuming all else equal and the additional passage of time with the children living with them, the children are expected to form a significant and positive psychological attachment and bond with . . . [Ted] and [Mary], and then be at a significant risk of suffering severe and enduring psychological or emotional harm if the child[ren]'s attachment and relationship with [Ted] and [Mary] is then permanently ended. . . . Permanency is unlikely to be achieved with [Jenny] or [George]. Permanency can be readily achieved with the proposed caretakers, [Ted] and [Mary], who have stated their wish and desire to provide permanent care, and to adopt the children if they are legally free for the same. This is the most supported permanency plan . . . .

Notably, Dr. Lee was aware and considered that when he performed the bonding evaluations in August 2019, Gabriel had not visited with defendants in several months, due to the preceding identified surrender. But Dr. Lee also knew Alex continually visited with defendants since birth, and neither child had lived with Mary or Ted on a full-time basis.

VI.

The guardianship trial commenced in November 2019 before another newly assigned judge. During the trial, the Division called various witnesses, including Dr. Lee, the only expert to testify, and caseworker Soler. The Law

Guardian called Agosto and Art as witnesses, and Jenny testified on her own behalf.

All counsel stipulated to Dr. Lee's expertise in clinical psychology, and he testified his opinions were provided within a reasonable degree of psychological certainty. Consistent with his earlier evaluations, Dr. Lee testified that if Gabriel and Alex were returned to defendants, and despite that Alex had no significant medical needs, both boys would be at a "heightened risk" for having their medical, educational, and nurturing needs neglected.

Dr. Lee stressed the boys were "very young, helpless, dependent children" "who count on the adult providing consistency, stability, protection, nurturance and support," yet with Jenny's "very low cognitive and intellectual functioning," it was likely Jenny's "ability to consistently meet the needs of these very young children" would be jeopardized. He stated her impulse control disorder would likely compromise her ability to be a minimally adequate parent to the young boys, and her dependent personality would affect her capacity to parent. Dr. Lee opined Jenny's "capacity to cope" was "poor," her level of insight was "[v]ery limited," and she "struggle[d] in following through, even when given very clear directions."

33

The doctor also observed Jenny's answers to questions about developmental milestones for children generally were "rather erroneous." By way of example, he noted that when he asked her when most children start to walk, she initially responded "three or four years. And then she changed her answer saying it was five or six years. And then she said it might be one year."

Additionally, Dr. Lee testified Jenny "struggled with some fairly unstable residence[s] in recent times" and "relocated a number of times in recent years." Noting Jenny received various services from the Division for well over two years by the time of his evaluation, Dr. Lee opined Jenny would not "become a minimally adequate parent within the foreseeable future." He concluded her "cognitive and intellectual issues are essentially lifelong. And they are not amenable to any kind of significant changes."

Dr. Lee testified, too, that despite her cognitive deficits, Jenny said she felt ready to care for Gabriel and Alex on a full-time basis. Further, she communicated "it was her plan . . . not [to] use outside childcare services, but instead to be at home with the children . . . and [George] would work." Dr. Lee testified he "did not support [Jenny] . . . being an independent caretaker of either of these children."

Additionally, Dr. Lee testified that because George had "some significant cognitive and intellectual limitations" he "did not support either child" being in George's independent care and he was unable to support George "as an independent caretaker . . . within the foreseeable future."

Dr. Lee deemed George's perception of situations as well as his basic views and beliefs to be "rather immature," and "often times . . . very simplistic." Further, Dr. Lee stated George's stress tolerance was "limited" and he was "easily overwhelmed." Despite George's limitations, he, too, told Dr. Lee he "was ready to take both . . . children on a full-time basis." George also informed the doctor of his intent to continue working and have Jenny provide childcare for Gabriel and Alex if he were reunified with the boys.

Turning to his bonding evaluations, Dr. Lee reiterated he "did not support reunification of either child with either birth parent." He testified "there is not a significant bond of either child with either birth parent. So[,] there's [a] low risk of severe and enduring harm for either child if their relationship with birth mother and birth father is permanently ended."

Dr. Lee testified, too, there currently "was not a significant and positive bond that was solidified for either [Gabriel] or [Alex] with [Mary or Ted]" but "there was and is a likelihood of the children solidifying that bond with [Mary

and Ted] in the coming months, especially if the children live with [Mary and Ted]."

In December 2019, Art testified. He stated that before he received Gabriel into his home, he was told the infant "had shaken baby syndrome." Jenny's attorney objected to the "shaken baby" reference. The judge ruled, "I am not going to accept that for the truth of its content. It's what he was told." Further, the judge clarified, "what really matters here . . . is what he thought, not a back doorway to get in a diagnosis that otherwise . . . is not evidential at this point."

Art also testified that before Gabriel was placed in his home, he was told Gabriel had a neck brace and "was going to need some follow-up visits and . . . some extensive care." Art stated "[t]here was [sic] a couple of times that [Gabriel] had to be hospitalized during his first summer" and was flown to duPont to have "an inner cranial shunt . . . placed." Jenny's attorney again objected to Art testifying about Gabriel's injuries; the judge overruled the objection, stating,

> if you're caring for a child, you need to know if a shunt
> was installed, for whatever reason, so that you are then
> made properly aware of what to be looking for while
> the shunt is still in. And that's very different than the
> witness indicating why a shunt was needed.

She added, "head injuries can be accidental of course."

Art testified there "generally wasn't a week that went by that there wasn't some type of . . . appointment with a doctor . . . [a]nd there was early intervention" for Gabriel, including occupational and speech therapy. Art also confirmed that after Gabriel was placed in his home, Mary and Ted traveled to see the infant monthly and "FaceTim[ed] daily or every other day" to engage with Gabriel. He stated the couple also "immediately flew up and were . . . at [his] home" after Alex was placed with Art and Sue. Art testified he and his wife "are very connected with these two young boys," adding, "we will adopt them if that's the . . . remedy."

On cross-examination, Art was asked when he and his wife decided it would be better for Mary and Ted to adopt the children. He answered, "[i]t was shortly after the identified surrender," explaining, "we have eight children and we wanted to move forward and do what was best for [Gabriel] and [Alex]."

Before the trial continued in January 2020, the judge was informed Gabriel was showing signs of distress during visits with defendants. She allowed the Division to terminate Gabriel's visits "if he [was] distressed and inconsolable and [defendants] and/or the caseworker [could] not redirect [Gabriel] into engaging in the visit." As the trial progressed and the judge heard similar concerns about Alex's reaction to supervised visits, the judge entered

broader orders to allow visits to be curtailed if both children were "distressed or inconsolable" and neither defendants nor a caseworker could "redirect the children into engaging in the visit."

The Law Guardian called Agosto to testify in January 2020. Agosto confirmed she used a Popti interpreter during her therapy sessions with defendants even though by the time the trial commenced, they had "greatly expanded their knowledge of Spanish." Agosto also testified she used written materials, including "Nurturing Parenting Program[,]" in her sessions with defendants and "began to use . . . simpler text" with defendants because "[t]he simpler text had a lot of illustrations and very few words on a page. And it was very easy to follow."

Agosto stated that when she asked defendants to tell her what they learned from their therapy sessions, "[t]hey gave a standard answer that they would not hit their children, and they would talk to them, if they needed to discipline them." Agosto testified defendants "were not able to give back some of the several parenting techniques and ideas that I was trying to give to them." She tried to explain materials to defendants again, but "also . . . used videos and . . . some other things to explain some of the ideas [she] was trying to give them" to

afford defendants "a variety of ways of learning some of the material that [she] was trying to present to them."  Agosto stated:

> I encouraged [defendants] to talk to other parents in their family, to utilize TV shows . . . .  I encouraged them to use their smartphone to go on the internet to learn about how children develop.  What to do if your baby has a fever.  I encouraged them to expand their general fund of knowledge by taking ESL classes and by expanding their social network, so . . . they would interface with other families.  I tried to use . . . many different ways of communicating with them . . . .  I found that there was a Popti app on the phone.  I encouraged them to get books from the library.  I told them how [they] could get a library card . . . .  So, I tried to be quite thorough in my attempts to help them understand what they needed to effectively parent their children, not just relying on the book.

Agosto was asked if she was alerted to any concerns about defendants' supervised visits with the boys.  She recalled a Division worker advising her to "address the issue of fondling because [the Division] had a concern that [George] had been fondling [Gabriel's] penis during a supervised parenting evaluation."  Further, Agosto noted that "[o]n another occasion, the Division asked [her] to address a concern that [George] had inserted his tongue into [Alex's] mouth"; when she did so, George responded, "but he's my flesh and blood, I just love him so much."  George subsequently agreed not to fondle Gabriel's penis or put his tongue in Alex's mouth after Agosto explained this

39

type of behavior was "stimulating" to a child. Agosto also stated, "there was another concern that was brought up when the family removed the helmet for [Gabriel], which he require[d] for his medical condition."

Asked on direct examination if Agosto knew of "any other modality" of treatment she could recommend for defendants to "improve their parenting to a standard where they could be reunited with their children," Agosto answered, "I don't believe so." On cross-examination, she admitted she was "frustrated . . . as a clinician" because of defendants' "inability to understand . . . the primal concern of this case." She stated that while she tried to help defendants "be better equipped to be parents[,] . . . they were not getting the primary concept of protection of children." On re-direct, Agosto confirmed her "main concern" was defendants "did not understand risk factors."

When Soler testified for the Division, she confirmed she was a permanency worker and an adoption worker between 2017 and 2019. She stated the Division used a Popti interpreter to assist defendants with "all services and evaluations." According to Soler, such services included "evaluations, psychologicals, bondings, parenting, individual counseling, and . . . [providing] updates on their children." Soler affirmed the Division also provided defendants with "parenting skills training," transportation, and visitation.

40

Additionally, Soler stated Gabriel was placed with his New Jersey resource parents because Gabriel "needed a resource parent . . . familiar with kids that are medically fragile. And . . . [Art's] resource family was." Soler also testified defendants failed to provide the Division with the names of individuals who could care for Gabriel, other than Jenny's sister and brother. She stated these two relatives were "ruled out" because "they all were living in the same home. They couldn't offer an explanation as to [Gabriel's] injuries either."

When Soler testified Gabriel's doctors suspected he was abused, Jenny's attorney objected. The judge overruled the objection, finding Soler's statement was not "offered for the truth of its contents, but . . . offered to show why the Division became involved." As Soler's testimony continued and she attempted to explain what the Division learned about Gabriel's injuries, Jenny's attorney again objected. The judge observed:

> This is almost a razor edge of information that's going to be an issue throughout the litigation of this matter. Which is whether these injuries are inflicted within a reasonable degree of medical certainty or not. Which is a very different issue than who inflicted, or even trying to narrow down who inflicted them.
>
> But to artificially have testimony about the Division's involvement, medical care, after-care needed, and a range of issues that come with any kind of serious medical intervention for any human being.

41

> To pretend that some of the treatable injuries just spontaneously appeared makes the record skewed.
>
> So, I'm going to rule on your standing objection by saying that it's not intended to create any inference that the parties or somebody they were responsible for . . . being with their child, and so they're responsible vicariously for the actions of that other person. That['s] . . . not what's inferred by describing the nature of the injuries.

The judge made clear she understood the restricted purpose of Soler's testimony, highlighting it was "not being introduced to make an inference that [defendants] caused or allowed the injury to be caused by some third person."

As Soler's testimony continued, she stated that once Alex was born and defendants learned he would not be released to their care, they asked the Division, "if we tell you what happened to [Gabriel], would [we] be able to take [Alex] home?" Soler recalled defendants later advised the Division Gabriel was injured in his babysitter's care. She affirmed George "gave a couple of explanations [as] to what could have happened to [Gabriel] while . . . the babysitter was caring for him," such as the infant falling down the stairs. However, Soler testified the Division's investigation did not lead it to conclude the babysitter abused Gabriel.

Soler also described the supervised visits the Division offered defendants. She stated that after the identified surrenders were vacated and visits with

Gabriel were reinstated, he would become upset during visits and "hide." "[H]e would cry that he wanted to go home" and "throw objects in the room." Soler testified she also noticed "[t]here was a lot of overfeeding" during the visits, "the kids climbed the ledge of the window" where visits occurred, and Gabriel would jump on the couch "standing up," compelling a caseworker to tell defendants "you have to tell him to get down." Soler stated defendants would not address this type of misbehavior "without prompting from the Division."

Further, Soler noted "there were times . . . the parents were taking [Gabriel's] helmet off . . . during the visits. So, they had to be redirected multiple times, don't take the helmet off." Also, Soler stated during one supervised visit, George put his tongue in Alex's mouth and was "flickering the tongue inside his mouth." She said George did this after he "turned away . . . from the supervisor, so the supervisor couldn't see what he was doing. But the supervisor saw him through the mirror that was in the room . . . [a]nd was able to tell him to stop." Despite these incidents, Soler testified when she investigated alternative service providers for defendants' benefit, they told her they did not want to pursue additional counseling because "they didn't feel they needed any counseling. . . . They stated they had to work, and due to work obligations, . . . they weren't interested in any counseling."

According to Soler, defendants' proposed plan for reunification was George "would continue to go to work and [Jenny] would be left in the caretaker role" for the children. Soler believed defendants did not have "any other friends or family members that could assist with caring for the children."

When Soler was asked how the boys were adjusting to their placement in the Alabama resource home, she testified she visited the boys there and "both seemed very comfortable and happy in the home." She attested neither child exhibited any behavioral issues after the move, and she was unaware of any concerns resulting from the Alabama placement. Also, Soler stated Mary and Ted wished to adopt both children.

Following Soler's testimony, George's attorney notified the judge of an agreement between counsel to modify the boys' visitation schedule again. Per the attorneys' stipulation, visits were to occur every third week moving forward, on Fridays, Saturdays, and Mondays, for two hours each day. George's attorney explained this modification would "save the children from flying back and forth on those other weeks."

Unfortunately, soon thereafter, visits shifted to a remote format, due to the pandemic. Accordingly, Soler and her colleagues facilitated weekly phone and video visits for defendants and the boys as the trial progressed.

Due to the pandemic, the hearing on April 30, 2020 proceeded remotely. Importantly, counsel utilized this hearing to address multiple potential redactions to an exhibit containing Gabriel's medical records from the time of his hospitalization in March 2017.[8] Counsel extensively discussed redactions to this exhibit while exploring the idea of not producing their medical experts from the Title Nine trial, i.e., Drs. DeJong and Scheller, for the ongoing guardianship trial. In that vein, counsel specifically addressed an offer from the DAG and the Law Guardian to refrain from trying to prove who caused or inflicted Gabriel's injuries or that defendants' delay in seeking treatment for Gabriel's March 2017 injuries "rose to the level of Title Nine abuse or neglect."

During the hearing, George's attorney told the judge, "I still have yet to hear . . . there [are] no longer any issues of abuse and neglect." The judge responded the offer from the Law Guardian or DAG "doesn't mean there aren't issues of abuse or neglect, right[? T]hat's what prong one is, but they're not trying to prove that [Gabriel's] injuries were inflicted." The Law Guardian

---

[8] The record reflects the judge stepped off the bench for a period during the April 30 hearing, without objection from counsel. During this time, the attorneys continued their negotiations regarding redactions to Gabriel's medical records.

agreed, stating, "there's a risk of harm which falls within neglect, which is part of prong one, but inflicted injuries [are] off the table."

Jenny's attorney remarked, "what I'm hearing right now, the DAG [is] taking abuse and neglect 'off the table.'" The judge interjected, "hold on, . . . it would almost be as though she's dismissing her case . . . if she says I can't prove prong one, so I don't think that's exactly what she meant. I think she meant inflicted injury, is that correct?" The DAG concurred with the judge's understanding and confirmed she would not try to establish the four prongs of the best interest test by trying to prove defendants inflicted injury upon Gabriel. The DAG explained,

> prong one . . . does not have to be within the confines of abuse and neglect . . . . [I]t's a substantial risk of harm[. O]r prong one is . . . has the child been endangered by the relationship[. T]hat doesn't necessarily require a Title [Nine] finding . . . so, . . . I will agree that probably the more accurate word is inflicted injury, and we will take that off [the table].

The DAG and Law Guardian further tentatively agreed they would not seek to prove by clear and convincing evidence a third-party inflicted Gabriel's injury.

The judge continued to address this issue, explaining, "the Division can prove the first prong [under N.J.S.A. 30:4C-15.1] without proving Title [Nine] abuse and neglect . . . . Title [Nine] neglect is different than other forms of

neglect and they're not trying to prove Title [Nine] neglect." The DAG again concurred with the judge's analysis.

In summing up the proposal from the DAG and the Law Guardian with respect to Gabriel's medical records, the judge stated,

> so therefore, . . . you're not trying to get in [the medical records] to prove that the parents either caused [the injury] recklessly or knowingly or certainly purposely, nor are you trying to prove that, based on the injury, the parents delayed at bringing the child for medical care.

Once again, the DAG and Law Guardian agreed with the judge's assessment of their proposal. But the Law Guardian stressed she would not consent to an order limiting her case if defense counsel still intended to call Dr. Scheller, explaining, "I'm not agreeing to let go of the idea of causation unless Dr. Scheller's not coming in. . . . [W]e're working towards something, but [the defense] today is saying, 'oh, I'm not agreeing that Dr. Scheller's not coming in.'"

Following up on the judge's request to have the DAG communicate where she stood, subject to the Law Guardian's "proviso," the DAG stated she and the Law Guardian

> now . . . would say [they] tentatively agree . . . they will not . . . seek to prove causation of injury by [the] parents nor to prove injury inflicted by the parents, and the Division and Law Guardian tentatively agree they

will not seek to prove a delay in seeking medical attention.

The judge clarified, "[F]or said injury . . . right?" and the DAG replied, "Yes." The DAG added, "[a]ny reference in prior testimony to the infliction or causation is not for the truth of [the] matter but [for] understanding of the issues and for the provision of services."

When the hearing ended, the judge entered an order, attempting to reflect the status of the parties' negotiations. The order provided, in part:

> On the condition that Dr. Scheller will not testify [for the defense], the Law Guardian and Division will not seek to prove causation of injury by the parents nor to prove injuries were inflicted [on Gabriel] by parents. The Law Guardian and the Division will not seek to prove that the parents delayed in seeking medical attention for the injuries.
>
> <u>Any references in prior testimony regarding the infliction or causation of injuries are not for the truth of the matter but for the witness's understanding of issues and for the provision of services</u>.
>
> . . . .
>
> This matter shall return on May 19, 2020 . . . for an additional case management conference. . . . Counsel shall be prepared to argue any remaining objections to evidence. <u>Counsel shall also be prepared to argue whether Dr. Scheller will testify</u>. . . .
>
> . . . .

Negotiations with counsel to continue.

[(Emphasis added).]

When the matter returned to court in May 2020, the judge conducted another case management conference and entered an order which simply stated, in part:

> Defense no longer plans to call Dr. Scheller to testify, given counsel's stipulation to P-46[, Gabriel's Medical Records from duPont,] and in light of the representation by the DAG and the Law Guardian that they no longer seek to prove infliction or causation of injuries, fault of the parents[,] or failure to seek medical care.

In the ensuing months, counsel learned the Supreme Court granted certification on Gabriel's Title Nine case. Accordingly, during a July 2020 hearing, defense counsel sought to adjourn the guardianship trial until there was a decision by the Supreme Court on that matter. The DAG objected to postponing the trial, stressing that while the source of Gabriel's injuries was unknown,

> that was not the only issue, not even the most prominent issue. The issue is that after the injury occurred, the Division started services with the parents, which included . . . a number of different services provided. And throughout that time, the experts said that [defendants] were unable to parent either child, and that's including [Alex], who has no medical issues.

. . . .

> . . . [W]e don't need that abuse or neglect finding for prong one because . . . more importantly, we've shown that the parents are just not capable, . . . given years of services.

The judge denied defendants' adjournment request without prejudice.

Because reversal of the abuse or neglect decision remained possible and witnesses who had testified indicated an awareness of Gabriel's injuries, during the July 2020 proceeding, counsel addressed what further redactions, if any, should be made to existing exhibits. They also discussed the purpose for which exhibits should be considered by the judge. The judge considered the parties' evidentiary issues at length and entered an order that day, itemizing in great detail the exhibits which were to be redacted and objections she overruled. Also, the judge detailed, where applicable, which "statements [in exhibits] were not offered to prove the infliction or causation . . . of injuries, or delay of medical care," and noted certain statements "would be limited to show Agosto's understanding of then current medical recommendations," while others were "not offered for the truth of the matter asserted."

Trial resumed in October 2020 with Jenny testifying in person. During her direct examination, Jenny testified she was "worr[ied] about the well[-]being of [her] children. And what happened to [her] child, . . . the babysitter is to

50

blame for." She also stated if the children were returned to her, she would "stop working because [she] would like to take care of them."

Asked how many children she had, Jenny answered, "four children. Two in Guatemala and the other two are [Gabriel] and [Alex] here." Jenny denied giving birth to any other child. Based on this testimony, Jenny's attorney promptly asked for a sidebar conference and for George to leave the courtroom. The judge accommodated the sidebar, during which George's attorney stated, "I believe that this witness may have perjured herself and . . . [Jenny's attorney] is trying to cure that by not having my client in the room." The judge denied the request from Jenny's attorney to have George exit the courtroom.

As Jenny's direct examination continued, her attorney asked Jenny to describe what she learned during parenting classes with Agosto. Jenny answered, "you don't leave children alone in a room because they can be scared by something and I believe that you have to watch your children all the time." Regarding opportunities she had for further counseling, Jenny admitted she was no longer in therapy, but claimed this was "[b]ecause the people who are in charge told us that we were finished with the therapist and . . . didn't have to go back anymore."

On cross-examination, Jenny conceded Soler offered her additional counseling opportunities and other services multiple times, but she declined those services. When counsel inquired if Agosto "at any point" told her she "learned all the skills necessary to successfully parent on [her] own," Jenny answered, "Yes."

Jenny also admitted to the DAG during cross-examination that she lied about the child she birthed in 2014. She stated, "I want to apologize for my behavior today. I lied in the beginning because I was afraid that [acknowledging the child] would prevent me from getting [Gabriel and Alex] . . . back."

When George's attorney cross-examined Jenny, he asked her, "what is best for your children?" The following exchange occurred:

> Jenny: Yes, I do want the best for my children. But, we're getting older and as we get older time is going by. There come[s] a time when I take care of my children now but then as they get older and I'm older they will take care of me. I will be depending on them.
>
> [George's attorney]: . . . [L]et me try that again. What do you think is best for your children?
>
> Jenny: The truth is I'm here in this courtroom because I love my children. I love my family. I love my children. And, one day when I am old, they will take care of me.

Following Jenny's testimony, George chose not to testify, and defendants called no other witnesses.

VII.

On December 3, 2020, the judge issued a lengthy oral decision, accompanied by a conforming judgment, finding the Division proved all four prongs under N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence. The judge also terminated defendants' visits with Gabriel and Alex.

As she rendered her opinion, the judge outlined her credibility findings. She found Dr. Lee "very credible"; the judge also credited the testimony of Agosto and Soler but found Jenny's testimony "demonstrate[d a] substantial lack of credibility in terms of lying to stay out of trouble."

Ten days later, the judge denied Jenny's order to show cause seeking restoration of visits. On December 22, 2020, the judge executed an amended final guardianship order, amplifying her oral decision and addressing defendants' objections to the initial guardianship decision. The amended order left the termination decision intact.

Each party appealed from the guardianship judgments; we consolidated their appeals. Further, we denied: Jenny's motion to restore visitation pending

appeal; George's request for a stay pending a decision by the Supreme Court in the Title Nine action; and his motion for summary disposition.

In September 2021, the Court unanimously reversed the Title Nine decision and remanded the matter to the trial court for a new hearing. J.R.-R., 248 N.J. at 378. In doing so, the Court rejected the burden-shifting paradigm enunciated in D.T., 229 N.J. Super. at 517, which had allowed trial courts in certain Title Nine cases to apply the doctrine of conditional res ipsa loquitur to shift the burden of proof to the parents to prove their non-culpability, J.R.-R., 248 N.J. at 372-73.

## VIII.

On appeal, Jenny raises the following overlapping arguments:

> POINT I. THE TRIAL COURT'S DECISION MUST BE REVERSED BECAUSE [THE DIVISION] FAILED TO ESTABLISH BY CLEAR AND CONVINCING EVIDENCE THAT TERMINATION WAS IN THE BEST INTERESTS OF THE CHILDREN UNDER N.J.S.A. 30:4C-15 AND N.J.S.A. 30:4C-15.1.
>
> A. The Trial Court Erred in Finding that the Division Had Demonstrated, By Clear And Convincing Evidence, That the Safety, Health or Development of the Children Had Been or Would Continue to be Endangered by the Parental Relationship with Their Mother.

1. The trial court erroneously disregarded the parties' explicit agreement that medical neglect was "off the table" and instead used it to demonstrate parental incapacity to satisfy prong one, severely prejudicing Jenny's defense.

2. Dr. Lee rendered an inadmissible net opinion regarding Jenny's cognitive limitations and inability to parent.

3. The trial court improperly relied on Dr. Lee's net opinion concluding that Jenny was unable to parent while disagreeing with him regarding his determination that Jenny was cognitively disabled.

B. The Trial Court Erred in Finding that [The Division] Had Demonstrated, By Clear And Convincing Evidence, That Jenny Was Unwilling or Unable to Eliminate the Harm Facing Her Children.

1. Jenny persevered with services despite being faced with a hostile service provider who held unreasonable expectations.

2. Jenny's lack of familiarity with American parenting mores and values did not demonstrate mental incapacity sufficient to satisfy prong [two].

3. [The Division] failed to demonstrate that separating the children from their current resource parents would cause serious and enduring harm.

C. The Court Erred In Holding That [The Division] Proved That It Had Made Reasonable Efforts To Provide Services To Help Jenny Reunify With Her Children Because [The Division's] Own Expert and Service Provider Admitted That The Services Offered Were Inappropriate And Inadequate.

A-1127-20

1. [The Division's] [o]wn [e]xpert and [s]ervice [p]rovider admitted that the services offered were inappropriate, inadequate, and not sufficiently tailored to meet Jenny's need.

2. [The Division] failed to provide adequate visitation.

D. The Trial Court Erred In Concluding That [the Division] Had Demonstrated, by Clear and Convincing Evidence, That The Termination Of Jenny's Parental Rights Would Not Do More Harm Than Good.

1. [The Division] [i]mpeded Jenny [f]rom [m]aintaining [a] [b]ond [s]trong [e]nough [t]o [s]urvive [fourth] [p]rong [a]nalysis.

2. The court erred by denying Jenny a plenary hearing to explore the legality of the proposed private placement adoption that [the Division] had countenanced.

3. The court's reliance on the deterioration in the quality of the visits after a seven[-]month gap in visits, due entirely to [the Division] and the removal of the children to another state, was improper.

POINT II. THE PROCEEDINGS BELOW DEPRIVED JENNY OF DUE PROCESS (Not Raised Below).

A. The Court Substantially Prejudiced The Defense By Not Informing the Parents That [It] Would Rely On Evidence Of Medical Neglect To Satisfy Prongs One And Two [of N.J.S.A. 30:4C-15.1(a)].

B. The Substantial Culture And Language Barriers, Exacerbated By The Covid-19 Pandemic, Infringed On

Jenny's Due Process Right To Participate In Her Own Defense.

George raises the following contentions for our consideration:

POINT I. THE TRIAL COURT'S DECISION MUST BE REVERSED BECAUSE [THE DIVISION] FAILED TO ESTABLISH BY CLEAR AND CONVINCING EVIDENCE THAT TERMINATION OF GEORGE'S PARENTAL RIGHTS WAS IN THE BEST INTERESTS OF THE CHILDREN.

A. The Trial Court Erred in Finding [the Division] Demonstrated by Clear and Convincing Evidence that the Children's Safety, Health, or Development Have Been or Will Continue to be Endangered by Their Parental Relationship with Their Father.

B. The Trial Court Erred in Finding that [the Division] Demonstrated by Clear and Convincing Evidence that George Was Unwilling or Unable to Eliminate the Harm Allegedly Facing His Children or Was Unable or Unwilling to Provide Them a Safe and Stable Home; [the Division] Did Not Prove Separating the Children from the Foster Parents Would Cause Them Serious and Enduring Emotional or Psychological Harm.

C. The Court Erred in Holding [the Division] Proved by Clear and Convincing Evidence that it Made Reasonable Efforts to Provide Services to Help George Correct the Circumstances that Led to His Children's Placement Outside the Home.

D. The Court's Determination [that] Termination of George's Parental Rights Will Not Do More Harm Than Good Was in Error.

POINT II.  GEORGE WAS DENIED DUE PROCESS
BECAUSE THE COURT WRONGLY RELIED UPON
EXCLUDED    EVIDENCE;    CULTURAL    AND
LINGUISTIC   BARRIERS,   AS   WELL   AS   THE
PANDEMIC, CONTRIBUTED TO SAME.

Defendants' arguments are unavailing.

Our scope of review on appeal from an order terminating parental rights is limited.  N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007) (citing In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)).  We will uphold a trial court's factual findings if they are "supported by adequate, substantial, and credible evidence."  N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014) (citing N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)).  "We accord deference to factfindings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012) (citing Cesare v. Cesare, 154 N.J. 394, 413 (1998)).  No deference is given to the court's legal interpretations, which we review de novo.  N.J. Div. of Youth & Fam. Servs. v. I.S., 202 N.J. 145, 183 (2010).

It is axiomatic that parents have a constitutionally protected right to the care, custody, and control of their children.  F.M., 211 N.J. at 447.  That right,

A-1127-20

however, is not absolute. In re Guardianship of K.H.O., 161 N.J. 337, 347 (1999); see also R.G., 217 N.J. at 553. "It is a right tempered by the State's parens patriae responsibility to protect children whose vulnerable lives or psychological well-being may have been harmed or may be seriously endangered by a neglectful or abusive parent." F.M., 211 N.J. at 447 (citing E.P., 196 N.J. at 102). At times, a parent's interest must yield to the State's obligation to protect children from harm. N.J. Div. of Youth & Fam. Servs. v. G.M., 198 N.J. 382, 397 (2009). "[C]hildren must not languish indefinitely in foster care while a birth parent attempts to correct the conditions that resulted in an out-of-home placement." N.J. Div. of Youth & Fam. Servs. v. S.F., 392 N.J. Super. 201, 209-10 (App. Div. 2007) (citing N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004)).

The Legislature created a statutory test for a trial court to determine whether a parent's rights must be terminated in the child's best interests. Therefore, per N.J.S.A. 30:4C-15.1(a), the Division must satisfy the following four prongs by clear and convincing evidence:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to

provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;[9]

(3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

The four prongs of the best interests test are not independent of one another. N.J. Div. of Child Prot. & Permanency v. T.D., 454 N.J. Super. 353, 379 (App. Div. 2018). Instead, they "are interrelated and overlapping," N.J. Div. of Youth & Fam. Servs. v. R.L., 388 N.J. Super. 81, 88 (App. Div. 2006) (citing K.H.O., 161 N.J. at 348), and should form "a composite picture" of what is in the best interests of the child, N.J. Div. of Youth & Fam. Servs. v. M.M.,

---

[9] Effective July 2, 2021, the Legislature enacted L. 2021 c. 154, amending laws pertaining to the standards for terminating parental rights and the placement of children with relatives or kinship guardians. N.J.S.A. 30:4C-15.1(a)(2) was amended to exclude from consideration the harm to children caused by removal from their resource parents. We discern no reason to apply the revised statute retrospectively. See James v. N.J. Mfrs. Ins. Co., 216 N.J. 552, 563 (2014) (recognizing generally statutes should be applied prospectively).

189 N.J. 261, 280 (2007) (quoting N.J. Div. of Youth & Fam. Servs. v. F.M., 375 N.J. Super. 235, 259 (App. Div. 2005)). Parental fitness is the crucial issue. K.H.O., 161 N.J. at 348. Ultimately, "the purpose of termination is always to effectuate the best interests of the child, not the punishment of the parent." Id. at 350.

Prongs One and Two

Prongs one and two of the best interests test "are related to one another, and evidence that supports one informs and may support the other as part of the comprehensive basis for determining the best interests of the child." In re Guardianship of D.M.H., 161 N.J. 365, 379 (1999). When considering the first prong of the best interests test, the court's focus is not "on a single or isolated harm or past harm," but rather "on the effect of harms arising from the parent-child relationship over time on the child's health and development." K.H.O., 161 N.J. at 348. Harm to other children may also be considered when analyzing the risk of harm to a particular child. N.J. Div. of Youth & Fam. Servs. v. R.M., 347 N.J. Super. 44, 68 (App. Div. 2002).

Turning to the second prong, "the inquiry centers on whether the parent is able to remove the danger facing the child." F.M., 211 N.J. at 451 (citing K.H.O., 161 N.J. at 352). "Prong two may . . . be satisfied if 'the child will suffer

61

substantially from a lack of . . . a permanent placement.'" Ibid. (quoting K.H.O.,

161 N.J. at 363); see also C.S., 367 N.J. Super. at 111 ("[T]he . . . statute[]

reflect[s] reforms acknowledging the need for permanency of placements by

placing limits on the time for a birth parent to correct conditions in anticipation

of reuniting with the child."). Thus, continued delay in termination and in

permanent placement can increase the harms identified pursuant to the first

prong. See D.M.H., 161 N.J. at 379. "In other words, the issue becomes whether

the parent can cease causing the child harm before any delay in permanent

placement becomes a harm in and of itself." N.J. Div. of Youth & Fam. Servs.

v. A.G., 344 N.J. Super. 418, 434 (App. Div. 2001).

Termination of parental rights may be supported by evidence "that the

parent substantially caused, directly or indirectly, the harm to the child." N.J.

Div. of Youth & Fam. Servs. v. D.M., 414 N.J. Super. 56, 81 (App. Div. 2010).

It is well settled that "harm" in this context is not limited to physical harm. See

In re Guardianship of K.L.F., 129 N.J. 32, 44 (1992) (holding "[s]erious and

lasting emotional or psychological harm to children as the result of the action or

inaction of their biological parents can constitute injury sufficient to authorize

the termination of parental rights"). Therefore, "courts must consider the

potential psychological damage that may result from reunification as the

62

'potential return of a child to a parent may be so injurious that it would bar such an alternative.'" N.J. Div. of Youth & Fam. Servs. v. L.J.D., 428 N.J. Super. 451, 480-81 (App. Div. 2012) (quoting N.J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591, 605 (1986)). Even when the parents are not blameworthy because they were "short-changed by either nature or society," the second prong is satisfied when their behavior "indicates a further likelihood of harm to the child in the future." A.W., 103 N.J. at 615-16. "Courts need not wait to act until a child is actually irreparably impaired by parental inattention or neglect" before concluding these prongs are satisfied. D.M.H., 161 N.J. at 383 (citing A.W., 103 N.J. at 616 n.14).

Satisfaction of prong two often requires expert testimony that the parent's behavior put the child "in substantial jeopardy to physical or mental health," and there is no "realistic likelihood that the parent[] would ever be capable of caring for the children." A.W., 103 N.J. at 607, 614. The court may also consider expert testimony that, despite the parent's good intentions, the parent's cognitive limitations or mental health issues are sufficiently severe to prevent him or her from providing minimally adequate parenting in a safe and stable environment. A.G., 344 N.J. Super. at 440.

The failure of a parent to provide a "permanent, safe, and stable home" engenders significant harm to a child. D.M.H., 161 N.J. at 383; see also M.M., 189 N.J. at 293 (upholding the trial court's termination of a father's parental rights where his wife, who had the intellectual functioning of a seven-year-old, created a dangerous and destabilizing environment). Similarly, "[a] parent's withdrawal of . . . solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child." D.M.H., 161 N.J. at 379 (citing K.H.O., 161 N.J. at 352-54). Such withdrawal constitutes a "failure to provide even minimal parenting . . . ." Ibid.

Guided by these standards, we are satisfied the judge did not abuse her discretion in finding the Division met its burden in showing by clear and convincing evidence defendants' ongoing parental incapacity harmed their children and they were unable to mitigate that harm. N.J.S.A. 30:4C-15.1(a)(1) and (2).

In addressing prong one, the judge recounted how Gabriel's injuries in March 2017 prompted the Division's involvement. But, consistent with the stipulations of counsel during the April and May 2020 case management conferences, the judge made clear she was not considering who might have caused or inflicted Gabriel's injuries, nor how the injuries may have been

exacerbated by defendants' delay in seeking medical care prior to Gabriel's March 2017 hospitalization. Instead, the judge stressed, "[a]ny information about whether [Gabriel's injuries were] inflicted or accidental or related to the child's reaction to . . . a very high fever, sepsis, meningitis . . . is immaterial because the issue was withdrawn from the court."

The judge then properly focused on what occurred after Gabriel's hospitalization. She noted defendants reported to the Division that Jenny "was . . . the only . . . caretaker of the child when this condition developed and that in terms of anybody who could've cared for the child[,] it was only mom and dad." Thus, "the investigat[ive] steps that the Division took were limited in the scope to that situation." The judge observed that "about [eighteen months] after the initial injury," "the parents revealed . . . they knew their child had sustained traumatic injury because of some type of [f]all at his babysitter's. And they gave that babysitter's name and indicated when they found out" what happened to the child. The judge concluded these

> subsequent developments in terms of the new information provided by the parents after [Alex] was born, [are] relevant to . . . [defendants'] flawed decision-making. And that flawed decision-making is relevant to the entire prong one and prong two proofs of the Division in terms of what the parents . . . learned . . . and [their] judgments in the future regarding the care of both of their children.

Highlighting defendants' ongoing parental incapacity, the judge found defendants

> demonstrated throughout this litigation, mom more than dad, that they didn't really understand how a fever caused [Gabriel's] injuries. They didn't understand the shunt in [his] brain. They didn't understand, despite explanation, including in Popti, . . . much about what a brain bleed is. . . . But they . . . really didn't get how a blunt force trauma impacts on a child's care, what the various medical interventions were, and then what follow-up was needed so the child would heal perfectly and . . . the parents [were] not forthright about the facts that would've helped them learn more about how the child was hurt in the way that he was.

To illustrate her point, the judge continued by referencing Gabriel's need for surgery in May 2017, some two months after his initial hospitalization. She stated:

> So[,] for example, with respect to the shunt, . . . the child was hospitalized and with [a] fever which may or may not be related to the brain swelling or bleeding, or inflammation of some type that required the shunt to relieve pressure[.] [T]he parents didn't demonstrate any understanding of why there was a little helmet on this child, which was to prevent him from falling so he wouldn't be reinjured . . . or the shunt wouldn't be affected.
>
>     . . . .
>
> But dad definitely removed the child's helmet without authorization July 3, 2018, July 10, 2018, [and]

66

June 26, 2018 during visits . . . [and] there's references to his removal of the helmet at a recent visit and [he was] told . . . more about why he shouldn't do it. . . . So, the court notes it's more than . . . three times.[10]

. . . [T]he helmet should've been in place from May 21, 2017 to May 21 of 2019. . . . When the parents were asked about the helmet, they said, "well, it just makes his head feel better."

The judge also concluded that despite defendants having met with a Division nurse and caseworker, with the assistance of a Popti interpreter, to review Gabriel's medical and developmental care, defendants exhibited nothing more than "the most simplistic understanding of the severe injury [Gabriel] sustained [and] the coordinated and highly professional care he required as a result."

Additionally, the judge found once Gabriel's condition became "somewhat stabilized . . . after the shock, hospitalizations, and the spiking fevers resolved," defendants "opted not to go" to Gabriel's Early Intervention evaluation, even though the service was "not dependent on income," and "it could've been such a rich source of information for the defendants. . . . That would've been a . . . start

---

[10] In her amplified opinion, the judge stated that according to the Division's case notes, there were "numerous dates when the helmet was removed by the parents despite frequent admonitions not to. Those dates included 10/10/17, 11/27/17, 3/6/18, 4/17/18, 6/26/18, 7/3/18, 7/10/18 and 7/18/18."

to understanding the nature of this child's injuries and healing process." In her amplified opinion, the judge added that defendants "did not then and still do not express an understanding of how important that evaluation was to secure necessary therapies to avoid developmental delays related to [Gabriel's] injuries." She found, too, that defendants, "up to and during the trial[,] continue[d] not to evidence even a basic understanding of the work [Gabriel] and the therapists were doing through the [E]arly Intervention programming, notwithstanding discussions the Division and Agosto had with them."

Further, the judge concluded that during the two years it took to resolve Gabriel's injuries, defendants "really weren't able to take care of him with his unique needs" and they "didn't make progress" despite receiving various recommendations from their caseworker and Dr. Pérez-Rivera.

In her amplified opinion, the judge questioned "[w]hether the parties would make future judgments about their children's well-being and protection as flawed as the ones which resulted in neither of them telling service providers, the court[,] or medical care providers for over eighteen months what they later said they knew of the circumstances of [Gabriel's] injuries." She found "[t]he decision to remain silent was joint [and] . . . demonstrated no understanding of the importance [for] care providers to have as clear as possible an understanding

of the mechanics of the child's injury." The judge expressed concern that "[a] similar omission, caused by [naiveté], distrust or defensiveness, regarding any future harm the children might sustain while in [defendants'] care, could put that child at risk of great harm." Critically, although defendants claimed they refrained from reporting Gabriel's babysitter to the Division because they relied on her telling them they would have Gabriel back in three months and "not to worry," the judge found defendants "knew that this was an impediment to [Gabriel's] reunification with them."

The judge emphasized she was not looking at the facts of the case "as the Division trying to backdoor some type of proof that the parents must have [hurt Gabriel] or . . . lie[d] about the babysitter." She reasoned:

> It is not necessary. It is not proper for me to do that. I am not doing that.
>
> I want to make that crystal clear. But it doesn't leave the issue irrelevant. [Gabriel] is not a child in a vacuum where his most central needs [for] the two years after his hospitalization can be ignored simply because the court is not looking at the question or relying on any inferences whatsoever, that the parents recklessly hurt this child or recklessly without regard for his well-being didn't disclose [what] happened to him.

In steering clear of a Title Nine analysis and noting she had not reviewed the factfinding decision in the preceding Title Nine matter, the judge highlighted

69

this was "[n]ot a blameworthy situation" and she was "not inferring [defendants] caused the injury or recklessly delayed treatment," for Gabriel; instead, her focus remained on defendants' parental incapacity in that "they didn't understand that this child needed to be seen."

The judge concluded defendants made "some progress" in parenting while the Title Thirty litigation was pending, but she determined they had not progressed sufficiently "to be able to provide [Alex], let alone [Gabriel,] with a safe and stable home." The judge specifically found Jenny "denied that [Gabriel] had any special needs" and she "had no real working knowledge . . . of what was done on his behalf."

Further, the judge credited and gave "meaningful weight" to Dr. Lee's testimony that defendants had a limited understanding of their children's developmental milestones. She also found defendants "never made any progress with understanding what" their children needed by way of discipline. By way of example, she determined that as Gabriel became older and was "running around, the parents really [did] not know[] what to do." She noted defendants did not correct Gabriel's behavior when he was "hitting a parent or climbing up . . . furniture in the visitation area . . . or balking on the ground in a lack of cooperation."

70

Although the judge found "visitation sessions were adequate with respect to parent-child affectionate interaction," she concluded the

> sessions did not evidence significant improvement regarding safety monitoring[,] development[,] knowledge[,] or structure during the life of the children's case and safety reminders were made by the [Division] staff with some frequency even in the controlled setting of the visitation room. The deterioration in the quality of the children's visits [was] not clearly observable until the children's placement was moved to their current pre-adopt home in Alabama[,] which occurred in late August of 2019. That move overlapped [Gabriel's] increasing ability to speak, and the language he had learned was English.

Additionally, the judge found "[t]he tongue incident" initiated by George during a supervised visit with Alex was "significant[]" because George failed to recognize this behavior would be "violating a boundary with the child that . . . could interfere with the child's comfort level and relationship." Likewise, she noted George was corrected during a supervised visit when he and Jenny played with Gabriel's penis during a diaper change for "about [forty-five] seconds." The judge stated, "I don't want to overemphasize those two incidents, but they do reflect [defendants'] understanding of parenting."

Turning to Jenny's "failure to inform professionals providing her parenting training that she was not a 'first-time' mother," the judge found Jenny "insisted . . . she had no prior experience raising children during the first six

months of the [Division's] case" and "only reluctantly confirmed the existence of these children after confronted with her medical history as she provided it in medical records in the [D]ivision's possession." The judge credited Agosto's testimony that her parenting education approach with Jenny was based on Jenny's misrepresentation she was a "first-time mother" and if Agosto "had known that mother had older children[,] she could have incorporated mother's specific prior experiences with raising those children in her parenting education dialogue and examples." Moreover, the judge credited Dr. Lee's opinion that Jenny's prior experience with her own children, who were ten and fourteen years old when Jenny immigrated to the United States, "should have provided her with more knowledge."

Further emphasizing defendants' demonstrated inability to parent Gabriel and Alex, the judge found George was "told . . . numerous times throughout this litigation . . . that mom was really a lot less ready than [he] would be to parent and interact with . . . [the boys]." By way of example, the judge stated "it was clear that the defendant father was more capable of identifying hazards[,] such as some choking hazards[,] and of communicating with the children non-verbally, despite language barriers. Mother demonstrated difficulty in having [Gabriel] follow routine parental direction during visits, as compared to father."

Thus, the judge was struck by the fact that after defendants were told there were concerns about Jenny's deficits, they "never deserted the plan" that if reunification occurred, "mother would remain in the home with the children and father would work outside of the home[,] as was the case before the Division's involvement."

The judge's findings on prongs one and two are not only amply supported in the record, but also are bolstered by the unrefuted testimony of Dr. Lee, the lone expert in the case. As we have discussed, Dr. Lee never wavered in his opinion defendants were not minimally adequate parents and would be unable to overcome their significant parenting deficits in the foreseeable future.

To the extent defendants argue the judge improperly considered the cause of Gabriel's injuries and defendants' delay in securing medical treatment for his injuries when she analyzed prongs one and two, despite agreements reached between counsel mid-trial, such contentions are belied by the record.

As is evident from her oral decision and amplified judgment, the judge did not arrive at her termination decision by relying on who or what caused Gabriel's injuries in March 2017, nor did she rely on any delay in treatment Gabriel experienced in March 2017. Instead, she focused on defendants' subsequent lack of understanding of the child's injuries, their ongoing inability

to do what was necessary to help Gabriel heal as he recovered from his injuries, and how their parental incapacity also would impact Alex, though the younger child did not suffer from a medical condition.

As the judge succinctly noted in the sections of her amplified decision addressing prongs one and two, there were various "examples of the risk of harm presented by [defendants] not understanding the extent of [Gabriel's] injuries . . . despite numerous discussions with [a Division] caseworker and [Agosto]." She illustrated her point by noting defendants "were never able to describe . . . the purpose of the helmet was to protect the child's head from re-injury in a fall or from running into furniture." Thus, in assessing defendants' inability to ameliorate harm to their children, the judge found "the extent of [Gabriel's] injuries and the details of his after[-]injury care . . . were not understood by the parents at the time of the injury and . . . are still not understood."

We are persuaded the judge's nuanced analysis is consistent with the stipulations reached by counsel and sanctioned by the judge during case management conferences held in April and May 2020. As the judge correctly noted in her amplified statement of reasons, counsel agreed mid-trial that

> allegations in the FG complaint that [defendants]
> inflicted the injuries which resulted in [Gabriel's 2017]

A-1127-20

hospital admission . . . either purposely, knowingly[,] or with reckless disregard of the risk of such injury would be withdrawn from the Division's termination of parental rights . . . complaint and proofs. . . .

Additionally, the allegation that the parent[s'] delay in seeking treatment for [Gabriel] rose to the level of Title Nine abuse or neglect by purposely, knowingly[,] or in disregard of risk of serious harm failing to act, was also withdrawn. Related evidential redactions were prepared and . . . . [t]he agreement was confirmed, on the record, . . . on April 30, 2020.[11] During this conference the court and counsel dialogued so as to clarify whether the stipulation was intended to allow evidence of the delay in obtaining treatment to be part of the Division[']s remaining [p]rong [one] proofs. More specifically, a [p]rong [one] theory that the child's safety, health[,] and development had been or would continue to be endangered by the parental relationship because the parents did not quickly seek medical care and lacked the capacity to know how to safely and adequately parent could be presented. The parties acknowledged that the stipulations and related redactions would allow that evidence of the delay and related issues of the parent[s'] understanding of the severity of the child's symptoms could remain as part of the [Division's] case. Evidence previously introduced regarding the circumstances immediately before and reasons for the child's hospitalization would

_____

[11] We recognize the record indicates any agreement reached on April 30 was tentative. This fact does not alter our analysis because once defense counsel stipulated during the May 2020 case management conference that it was unnecessary to have Dr. Scheller testify, the parameters for how Gabriel's injuries could be considered by the court were finalized. Also, it is evident any remaining redactions approved by the judge during the May 2020 proceeding were based on the stipulations reached between counsel during the April and May 2020 case management conferences.

75

> remain in the record but only as relevant to the issue of
> <u>parenting capacity and decision making</u>.
>
> The subsequent withdrawals of evidence and
> witnesses[,] as well as redactions to the Division's case
> notes . . . and other documentation were consistent with
> counsel's agreement.
>
> <u>The language of the [o]rder confirming the
> stipulations did not include all of the detail outlined
> above</u>.
>
> [(Emphasis added).]

### Prong Three

N.J.S.A. 30:4C-15.1(a)(3) requires the Division make "reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home[,]" and the court to "consider[] alternatives to termination of parental rights[.]"  Although the judge here found "the Division . . . prove[d] the two parts of the third prong by clear and convincing evidence," defendants contend the Division failed to provide adequate services for the purpose of reunification.  Again, we disagree.

"Experience tells us that even [the Division's] best efforts may not be sufficient to salvage a parental relationship."  <u>F.M.</u>, 211 N.J. at 452.  Moreover, "if the Division ha[s] been deficient in the services offered to" a parent, reversal is not necessarily "warranted, because the best interests of the child controls[]"

the ultimate determination.  N.J. Div. of Youth & Fam. Servs. v. F.H., 389 N.J. Super. 576, 621 (App. Div. 2007).

Here, the judge found the Division established the third prong of the best interests test, in part, because "[t]he Division provided numerous family team meetings and always had the counselor there. . . .  [T]his provider really got to know and care about this family. . . .  [T]hat came through in Ms. Agosto's testimony.  Ms. Soler did as well."  Further, the judge found Dr. Pérez-Rivera's evaluations and recommendations provided defendants with necessary information to assist them in parenting.

The judge specifically noted, Agosto provided "weekly bi-lingual parenting counseling . . . from the inception of the case until January of 2020," albeit with "breaks in service," and "[h]er sessions were conducted with the assistance of a Popti interpreter through [a] language line."  The judge also found Agosto

> spoke frankly and plainly to the parents about parenting, using a simplified curriculum which they seemed to understand.  However, information they learned did not appear to be retained over time, such as the importance and reasons for the child's . . . helmet . . . or the range of developmental stages for children.  She shared Dr. Pérez-Rivera's recommendations and repeatedly encouraged [defendants] to take advantage of free English as a second language and literacy courses . . . .  The court

A-1127-20

observed that Ms. Agosto's attendance at [Division] Family Team Meetings . . . allowed for hands-on collaboration . . . with the assistance of a Popti interpreter [which] was a sound plan to assure that the parents had input into their counseling and services plans, understood what they were expected to do and had a mechanism to have their questions and concerns addressed. . . . [Agosto's] recommendations regarding the parents obtaining more practical literacy skills w[ere] specific in terms of the location of classes . . . and how to utilize the internet to obtain a range of . . . parenting videos[,] including Popti-Spanish interpreting and basic parenting issues and ideas. . . . [V]isitation sessions frequently document dad being able to use his phone to play games and watch movies with [Gabriel] during visits. . . . [A]nd mother expressed that she had in fact used the internet to access videos about how to parent and found them helpful.

The judge also noted

[t]hroughout 2020 . . . the . . . caseworker repeatedly asked . . . [d]efendants whether she could refer them to parenting classes and they continually and politely declined. They explained that they did not feel they needed more information to parent. They also stated that they had to work and could not participate in services as a result.

Regarding the boys' placements, both in New Jersey and then Alabama, the judge concluded the Division engaged in "concurrent planning," whereby

[t]he goal was reunification for the parents. But . . . early in the litigation, it was known that ultimately, . . . should the Division seek and the court grant a . . . termination of parental rights[,] . . . at the request of the then current resource home, who was willing to adopt,

78                                                    A-1127-20

and apparently still are, . . . that a judge . . . might very well be asked to approve moving the children out of state to Alabama, which of course, . . . ultimately happened.

The judge determined it was reasonable for the Division to initially place Gabriel with his New Jersey resource parents, despite that this was "[n]ot a Spanish speaking home." She found Art and Sue "had a lot of experience with caring for a child who had serious issues that required medical monitoring, appointments, follow[-]up, careful observations, [and] careful implementation of various recommendations from healthcare providers to assure that he healed well. . . . That's why they were chosen."

Although the judge expressed "it would've been helpful for there to be more candor" about what Art, Sue, Mary, and Ted had planned for Gabriel and Alex, she declined to find any resource parent had "unclean hands." Further, she found the Division documented the resource parents' plans "over and over again." The judge also found no fault with her predecessor's decision to allow the boys' move to Alabama, noting when that decision was made, it was anticipated a trial would be conducted "soon" and "nobody could've predicted this pandemic."

To the extent certain other services or activities were not offered to defendants, the judge found defendants

did not progress to be able to safely manage the needs of their children who were at two different developmental stages, either out[]doors or in a public place such as a park or public library. Mobility out of doors was impacted because simultaneous interpreters were needed in Spanish and Popti . . . . Additionally, the parents struggled with ideas for visitation activities even in the more sheltered setting of the [Division] office.

The judge rejected defendants' argument the Division should have explored other options for "an in-home or community-based parenting service," concluding "[n]o further specific viable service, able to utilize the necessary simultaneous Popti-Spanish and English double interpreting was identified during this litigation" and "identifying such a unique service was not caused by lack of reasonable effort by the [Division]." Moreover, the judge determined the Division's services "were coordinated" and "had a reasonable potential to succeed." While she acknowledged the Division's efforts "did not succeed," she found that did "not mean that the efforts weren't reasonable." Our review of the record convinces us the judge's findings on prong three are well-supported by competent credible evidence.

As to the remaining requirement under prong three, for the sake of completeness, we note defendants do not contest the Division considered the two placement options they offered. Also, defendants do not identify a viable

placement alternative overlooked by the Division after Jenny's brother and sister were "ruled out." Thus, we cannot conclude the judge abused her discretion in finding the Division established both elements of the third prong by clear and convincing evidence.

Prong Four

The fourth prong of the statute requires the court to determine that termination "will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). It serves as a "'fail-safe' inquiry guarding against an inappropriate or premature termination of parental rights." F.M., 211 N.J. at 453 (quoting G.L., 191 N.J. at 609). "The question ultimately is not whether a biological mother or father is a worthy parent, but whether a child's interest will best be served by completely terminating the child's relationship with th[e] parent." E.P., 196 N.J. at 108. Typically, as to this prong, "the [Division] . . . offer[s] testimony of a well[-]qualified expert who has had [a] full opportunity to make a comprehensive, objective, and informed evaluation of the child's relationship with both the natural parents and the foster parents." F.M., 211 N.J. at 453 (quoting M.M., 189 N.J. at 281).

A child "deeply needs association with a nurturing adult[,]" and a sense of "permanence in itself is an important part of that nurture[.]" A.W., 103 N.J.

at 610. "When a parent has exposed a child to continuing harm through abuse or neglect and has been unable to remediate the danger to the child, and when the child has bonded with foster parents who have provided a nurturing and safe home," the termination of parental rights "likely will not do more harm than good." E.P., 196 N.J. at 108. The child's need for permanency and stability emerges as a central factor. K.H.O., 161 N.J. at 357.

The ultimate determination on the fourth prong cannot be made simply by showing "the child has bonded with foster parents who have provided a nurturing and safe home," or that terminating parental rights "likely will not do more harm than good" because it would provide the child with the benefit of a "permanent placement with a loving family." E.P., 196 N.J. at 108. Nor can it be made simply upon finding that the bond with the foster parent is stronger than the bond with the biological parent, because that is an expected result of an early or lengthy removal. G.L., 191 N.J. at 608-09. Termination is only appropriate when the absence of permanency would cause harm, and when the parent is unlikely in the reasonably foreseeable future to become capable of primary caregiving for the child without risking harm. L.J.D., 428 N.J. Super. at 483-87. That is the case here.

As the judge noted, she was able to "look at the length of the placement, [and] its impact on the child[ren's] ability to be secure, and develop in a known foreseeable home." She also accepted Dr. Lee's testimony that Gabriel and Alex were "on a path to bond with" Mary and Ted, and found the Division proved Mary and Ted were "able, and willing, and committed to mitigating any harm to the children from having their relationship with their parents severed." But significantly, she also found "compelling" Dr. Lee's testimony that he did not envision defendants being able to adequately provide for their children now or in the foreseeable future.

Acknowledging defendants experienced an "unusual visitation arrangement" and endured breaks in visits over the life of the case, particularly during the pandemic, the judge stressed these "breaks are not such that they independently created this situation which cause[d] the parents not to be able to – at this moment – provide a safe and adequate home for the children." She also emphasized defendants' visitation sessions "did not evidence significant improvement regarding safety monitoring[,] development[,] knowledge[,] or structure during the life of the children's case and safety reminders were made by [Division] staff with some frequency even in the controlled setting of the visitation room." (Emphasis added).

Because the record makes clear:  Gabriel and Alex were in placement from the time they were infants; Gabriel and Alex were in the process of bonding with their Alabama resource parents when Dr. Lee evaluated them and predicted they would bond with Mary and Ted within several months; the boys continued to thrive in the care of Mary and Ted long after Dr. Lee conducted his bonding evaluations; Mary and Ted wished to adopt both boys; and Dr. Lee concluded defendants remained incapable of parenting the boys now and in the foreseeable future, we are satisfied the judge properly concluded termination would not do more harm than good.

### Due Process

Turning to defendants' due process arguments, we note due process generally "requires adequate notice and a fair opportunity to be heard." N.J. Div. of Child Prot. & Permanency v. K.S., 445 N.J. Super. 384, 390 (App. Div. 2016) (quoting N.J. Div. of Youth & Fam. Servs. v. M.Y.J.P., 360 N.J. Super. 426, 464 (App. Div. 2003)).  In cases involving the termination of parental rights specifically, "[w]hen the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures." Ibid. (quoting Santosky v. Kramer, 455 U.S. 745, 753-54 (1982)).  Although "it is well established as a matter of due process principle that procedural requirements are

more demanding in parental termination cases than in ordinary civil actions," due process "is a flexible concept and calls for such procedural protections as the particular situation demands." M.Y.J.P., 360 N.J. Super. at 464, 467.

Guided by these standards, we are convinced defendants due process claims are without merit. R. 2:11-3(e)(1)(E). Indeed, the record establishes they received adequate procedural protections, including fair notice and an opportunity to be heard. Moreover, it is evident from the record that each judge tasked with presiding over this complex guardianship matter consistently accommodated defendants' cultural and language barriers, ensured interpreter issues were resolved for defendants' benefit, and addressed complications arising from the pandemic in a timely manner while also ensuring services continued to be coordinated through the Division.

In sum, we perceive no basis to disturb the judge's factual findings nor her legal determinations under N.J.S.A. 30:4C-15.1(a). To the extent we have not specifically addressed any of defendants' remaining arguments, we are satisfied they are without sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1127-20